56 CCPA

**Application of Howard M. DURBIN and John F. Wood.**

**Patent Appeal No. 8053.**

United States Court of Customs and Patent Appeals.

Jan. 16, 1969.

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. The application, serial No. 438,002 filed March 8, 1965, entitled "Phonograph Pick-

Marshall A. Burmeister, Chicago, Ill., for appellants.

Joseph Schimmel, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN, and KIRKPATRICK *, Judges.

ALMOND, Judge.

This is an appeal from the decision of the Board of Appeals affirming the rejection of claims 6 through 9 of appellants' application.[1]

The invention relates to a pickup device for use with stereophonic phonograph records wherein the two sound channels are recorded in a single groove. One system of cutting such a record involves simultaneously modulating the cutting head by impressing the signal of one of the channels along a vertical axis and that of the other along a horizontal or lateral axis. In a second system, the cutting head is modulated along two orthogonally related axes which are disposed at 45 degrees to the plane of the record. While the application describes both systems, the appealed claims are drawn to a pickup particularly suitable

up and Turnover Mechanism," is denominated a continuation of an application filed May 21, 1958, and includes several allowed claims.

for use with records constructed according to the latter method.

Claim 6, which is representative, reads:

6. A stereophonic phonograph pickup comprising a pair of piezoelectric elements having elongated bodies and electrodes disposed on opposite surfaces thereof, each of said elements generating electrical potentials of opposite sign on the electrodes responsive to bending along an axis normal to the axis of elongation and normal to the axis between electrodes, means for mounting the elements at one end in parallel spaced relationship with the axis between and perpendicular to the electrodes of one element disposed normal to the axis between and perpendicular to the electrodes of the other element, the end of the element opposite said mounting means being free for movement parallel to the axis between the electrodes of said element, respectively, a yoke having in a first portion thereof a slot extending therein on a plane normal to the plane of the axes of elongation of the generating elements and equally spaced from the generating elements, said yoke having two other elongated portions of compliant material extending from the first portion with the axes of elongation of said other portions being generally normal to each other, the piezoelectric elements being secured at the ends opposite the mounting means to the ends of said other portions opposite the first portion respectively, the axis between the electrodes of each piezoelectric element being generally parallel to the axis of elongation of the other portion of the yoke secured thereto, a stylus holder having a rod disposed in the plane of the slot and mounted at one end to the means for mounting the elements, said rod being compressed within the slot of the yoke, and a stylus secured to the end of the stylus holder opposite the mounting means and disposed in the plane of the slot.

A simplified sketch, sufficiently representative of the features of appellants' pickup that are in issue here for present purposes, was provided as an appendix to the brief for the Commissioner.[2] That sketch is reproduced here:

Symbolic cantilever support for crystals 40 and 42, and also for stylus holder 68

40

52 ( yoke )

76 ( reduced portion for pivot effect )

42

57

68

70    74    57

( record disc )

2. The nature of the views of the pickup in the application drawings and the large amount of detail shown therein make those drawings unsuitable for use here.

Referring to the sketch, appellants' structure includes two piezoelectric generating elements 40 and 42 mounted along parallel-spaced axes but with their transverse axes normal to each other and each at 45 degrees to the record disc. The rear end of each of the generating elements is embedded in a block shown to the right of the drawing, which block is of electrically insulating material such as rubber or vinyl plastic secured in a pickup casing not shown. The front end of each generating element is embedded in a yoke 52 which is of electrically insulating compliant material such as rubber or vinyl plastic and floats within the casing for the pickup. A circular opening in the yoke 52 between the ends of the elements 40 and 42 has the effect of forming two leg portions 57 in the yoke which extend normally from the transverse axes to intersect remotely thereof. A stylus 70 is mounted on the end of a holder comprising a rod 68 attached at its other end to the pickup casing. The rod has a restricted portion represented at 76 to cause it to act as if pivotally connected to the attaching means. The rod 68 is "wedged" within a groove 74 at the lower end of the yoke 52.

In operation, movement of the stylus 70 is transmitted to the yoke 52 and hence through the legs 57 to the generating elements 40 and 42. Since the force impressed on the stylus responsive to one channel of the recording is at 45 degrees to the axis of the stylus, the force is normal to the transverse axis of one generating element 40 or 42 and parallel to the transverse axis of the other generating element. In this connection the application states:

Because the generating elements are more compliant to forces normal to the transverse axis, one of the elements will be deflected or bent to a substantially greater degree than the other, thus producing a substantially greater electrical response than the other element. Further, the element driven normal to its transverse axis is driven by compressing the compliant yoke 52, while the other element is driven by shearing the compliant yoke. Both of these effects combine to result in a substantial electrical output from one element and a small electrical output from the other element, or in other words, electrical isolation between channels.

The electrical circuits, not shown in the above sketch, require only brief comment. Thus, the generating elements 40 and 42 are provided throughout their length with electrical contacts engaging the opposing surfaces which are normal to the effective direction of operation of the respective legs 57. The pair of contacts for each generating member is connected to energize a different one of the sound reproducing channels of a phonograph with an electrical signal corresponding to the deflection or vibration of the stylus in the appropriate plane.

The claims stand rejected as obvious over prior art under 35 U.S.C. § 103. The references are:

Batsch, German printed application T 11092 VIIId/42g, December 13, 1956

| | | |
|---|---|---|
| Keller et al. (Keller) | 2,114,471 | April 19, 1938 |
| Burt | 2,328,952 | September 7, 1943 |
| Ross | 2,991,331 | July 4, 1961 |

Batsch discloses a pickup or recording head for two-channel stereophonic operation illustrated as follows:

Abb.3

The system shown is for use where one channel is represented by deflections in a vertical direction and the other in a horizontal or lateral direction. Two crystals 1 and 2 are of the "torsion-flexing" or twister type, attached to a support at their rear ends and to supports or "noses" 3 and 4, respectively, at one corner of the front ends. As a result, twisting of the crystals by forces exerted on the respective unsupported corners provides corresponding electrical signals. A one-piece coupling member attached to the front end of the crystals and carrying a stylus 6 acts to transmit the vertical and lateral vibrations of the stylus to the crystals 1 and 2, respectively. According to Batsch:

The arms 7 and 8 of this member extend at right angles to each other and merge at the center in an enlarged portion 9. The dimensions of this portion must be such that the needle support 5 can be secured to it by the pin 10. The other ends of the arms are enlarged to form rectangular portions 11 and 12, each of which is provided with a rectangular aperture, in which the crystals 1 and 2 may be firmly fitted.

Batsch also states:

It may be mentioned that the terms vertical and lateral recording include generally two recordings having vibration planes which extend at right angles to each other. The vibration planes may be inclined, e. g., by 45° from the horizontal.

Keller compares stereophonic recording and reproducing systems where the two channels are formed in a single groove as vertical and lateral undulations with systems in which the planes of vi-

bration are normal to each other and at 45 degrees to the surface of the record.

Illustrative of the Keller disclosure are Figs. 3 and 5:

FIG. 3

FIG. 5

Fig. 3 shows a recorder adapted to cut vertical and lateral undulations in a record groove as a result of signals impressed on electromagnetic units 101 and 102, respectively.[3] The patent states:

> In this recorder the shaft 103 of the unit 101 has a horizontal arm 104 connected to the vertical arm 105 which is secured to the stylus holder 106 and is adapted to drive the stylus 107 vertically to cut' a hill-and-dale record. The shaft 108 of the unit 102 has a vertically depending arm 109 and a horizontal arm 110 secured to the stylus holder 106 for driving the stylus laterally to produce a lateral cut record. The arm 110 has a section of reduced stiffness at each end and the arm 105 has a similar section at its upper end so that both units may drive the stylus simultaneously without reacting on one another and the vibrating system is constrained to move only in the desired modes by the cantilever spring 111.

Fig. 5, in a manner apparent from mere inspection, operates to cut undulations normal to each other and at 45 degrees to the record in response to signals impressed on the electromagnet units 31 and 32, respectively.

3. Keller contemplates electrically combining the signals from the two channels to provide two resultant signals which are applied to the electromagnetic driving units so as to provide a groove having 45 and 45-degree relationship relative to the original channel signals. That, however, is immaterial to the significance of the reference as used in the rejection.

While the specific description of the Keller structure refers to recording rather than reproducing, the patent states that the structures "when proportioned according to well-known reproducer requirements * * * will also serve to reproduce both recordings in the groove simultaneously * * *."

Burt discloses several single channel phonograph pickup devices, the most pertinent being that of Fig. 5 shown here:

FIG. 5.

In this device, a piezoelectric crystal 7 of the twister type is clamped at one end between a pair of clamping blocks 9 with the other end received in a crystal holder 13 of rubber having a downwardly extending needle holding portion 17. With respect to this figure, the patentee states:

> * * * I mount the needle 19 on the forward end of a short length of wire 35 secured to the casing 1 and received in a slot formed in the lower portion of the needle holder, the wire being preferably compliant in all directions.

Burt further states that "[t]o those skilled in the art, it will undoubtedly be obvious that * * * instead of applying my improved crystal holder to a crystal of the torsional or twisting type, as herein described, it may be applied to a crystal of the bending type equally well."

Ross also relates to single channel phonograph pickup devices using a single piezoelectric generating element. He discloses different structures using twister and bender type elements, respectively. In the latter, a nose piece extending forwardly of the floating end of the element has a slot in its end, and a member carrying a stylus at one end and anchored to the housing at the other end fits within that slot at an intermediate point.

The examiner rejected the claims as obvious under 35 U.S.C. § 103 on Batsch in view of Keller, referring specifically to the application of those references in framing rejections in previous decisions on motions in two dissolved interferences involving the appellants. He further referred to Burt and Ross on the point of substitution of bender type piezoelectric elements for the twister type and the use of a drive utilizing a slot-type connection for the stylus arm. We find that rejection, sustained by the board, to be free of reversible error.

Although the Batsch Fig. 3 structure is arranged for use with records grooved with vertical and lateral projections for the respective channels, the disclosure in the reference that the vibration planes may be inclined by 45 degrees to the horizontal constitutes a clear suggestion that the illustrated Fig. 3 construction thereof be modified to function according to the latter alternative mode. Moreover, each of Burt and Ross provides clear and convincing evidence that one skilled in the art would be aware of the interchangeability of bender type piezoelectric elements for the twister type elements in pickup structures such as that of Batsch's Fig. 3.

Appellants contend that the appealed claims are patentably distinguished in the limitations "the end of the element opposite * * * [said] mounting means being free for movement parallel to the axis between the electrodes of said element" (claim 6) and "a stylus coupled to the first portion of the yoke and disposed in a plane normal to the plane defined by the axes of elongation of the piezoelectric elements" (claim 7) and similar recitations. In support of that position, they argue at length the alleged difficulties in modifying Batsch in accordance with the prior art teachings to provide a pickup utilizing bender type piezoelectric elements and operable on records with vibration planes normal to each other and at 45 degrees to the horizontal.

We do not find the suggested modification to be either as difficult as appellants would make it or unobvious. Rather, we agree with the solicitor who

urges (with reference to record omitted):

Of course, the examiner's rationale contemplates elimination of the noses 3 and 4 [of Batsch's Fig. 3] "so that conventional bender type of piezoelectric elements can be substituted for the twister type elements." This is perhaps the simplest and most obvious change in Batsch's construction, to accommodate bender crystals in place of twister crystals. Realization that a cantilevered element can be flexed by a normal force is as commonplace as bouncing up and down on a diving board. Anyone of normal experience would appreciate that forces exerted through Batsch's arms 7 and 8 would bend flexible elements disposed as 1 and 2 are, absent the corner anchors 3 and 4. As for balancing the forces transmitted by the arms 7 and 8 to avoid twisting of the substituted bender elements, such would merely require the obvious centering of arms 7 and 8 medially of the widths of the bender elements. Again, this follows from commonplace experience. To avoid rocking the boat, stay in the center.

Appellants emphasize that Batsch does not disclose a symmetrical arrangement wherein the stylus is "equidistant from the piezoelectric elements." However, as stated in one of the interference motion decisions to which the examiner referred, a symmetrical arrangement inherently results from the conversion to a 45–45° system suggested in Batsch in place of the 0–90° system illustrated in Batsch. Moreover, comparison of the Figs. 3 and 5 systems of Keller, as suggested in the same motion decision, plainly teaches the use of a symmetrical arrangement for the 45–45° system. We further agree with the observation of the solicitor that "[b]ilateral symmetry for Batsch's compliant Fig. 3 yoke, when converted to a 45–45° system, is naturally indicated by the need for equal amplitude reproduction in the two channels."

The recitation concerning the disposition of the rod carrying the stylus within the slot in the bottom of the yoke is also relied on by appellants as to claims 6, 8 and 9 in which it appears. The examiner took the position that it was obvious from Burt and Ross to drive the rod of Batsch in that manner. The board concurred.

Appellants urge in their brief:

The recited structure of claims 6, 8 and 9 is the structure which provides mechanical advantage with a compliant yoke for the first time known to the art. The amplification of force exerted on the bender element through a compliant yoke is novel and achieves a greater output than could be achieved otherwise.

However, we note that the "needle holder 17" of Burt having a notch for the stylus arm 35 therein is an integral part of compliant holder 13 and agree with the solicitor that "the arm 35 clearly provides a lever-type mechanical advantage for the compliant holder or yoke." We are satisfied that Burt makes it obvious to employ the construction in question on the Batsch pickup as modified, with such mechanical advantage as appellants obtain constituting an obvious and inherent result of such action.

We also agree with the examiner that the recited arrangement of the stylus holder in a slot in the yoke would be obvious from Ross, having particular reference to the structure used with his bender type element.

Certain material including decisions on motions in the two terminated interferences involving appellants was added to the record on motion of the Commissioner with the matter of assessment of printing costs to be determined at final disposition of the appeal. It having been found necessary to refer to the added material for a full understanding of the examiner's rejection, we assess the costs of printing it against appellants.

The decision of the board is affirmed.

Affirmed.